**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KENNETH E. DUKES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-cv-00340-RDP** |
| | } | |
| **SHELBY COUNTY BOARD OF** | } | |
| **EDUCATION, et al.** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendants' Motion for Summary Judgment.  (Doc. #

18).  The parties have fully briefed the Motion for Summary Judgment (Docs. # 19, 21, 23), and

the Motion is under submission.  After careful review, and for the reasons explained below, the

court concludes that the Motion for Summary Judgment is due to be granted.

**I.      Factual Background**[1]

This employment discrimination action concerns two promotions granted by Defendant

Shelby County Board of Education (the "Board") in 2012 and 2014, respectively.   Plaintiff

applied for the positions, was qualified for them, and interviewed for the positions, but was not

selected for either position.  He claims the failure to promote him was discriminatory.  The court

begins its review of the facts by discussing Plaintiff's work history and leadership activities.

Then, the court will discuss each promotion, in turn.

---

[1]    The facts set out in this opinion are gleaned from the parties' submissions and the court's own
examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the
nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These
are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established
through live testimony at trial.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th
Cir. 1994).

## A. Plaintiff's Work History and Leadership Activities

Plaintiff began working for Shelby County Schools ("SCS") in 1986 as a substitute bus driver. (Dukes Deposition at 13-14).[2] SCS hired him as a permanent bus driver in 1988. (*Id.* at 15, 20). Plaintiff also served as a volunteer football and basketball coach for several years, before transitioning to an assistant coach in the early 1990s. (*Id.* at 28). From 1989 to 1994, Plaintiff worked as a bus driver for Shelby County Area Transportation during summers and weekends. (Doc. # 20-1 at 61). In that position, he drove Shelby County residents to various appointments and transported soccer camp attendees from an airport to the University of Montevallo. (Dukes Deposition at 28-29).

Since the beginning of his career with SCS, Plaintiff has consistently driven a bus route transporting students to Montevallo High School. (*Id.* at 23). Plaintiff also has driven a morning bus route transporting students from Montevallo High School and Calera High School to the College and Career Center in Columbiana, Alabama. (*Id.* at 23-24, 35). He has transported students from the Career Center to Montevallo High School each morning as well. (*Id.* at 35). Finally, he has driven afternoon routes that transport elementary, middle, and high school students in Montevallo to the Wilton community. (*Id.* at 37-38). Plaintiff has been a bus driver in the same community for more than twenty years, although he drives different routes from year to year. (*Id.* at 38). Plaintiff has served on a committee of bus drivers who make recommendations to the SCS administration about "bus routes, bus equipment and apparatus needs, policies with respect to bus drivers, and other matters." (Doc. # 22-2 at 3).

In 2008, Plaintiff obtained a bachelor's degree from the Birmingham Easonian Baptist Bible College. (Dukes Deposition at 16-18). He has served as a pastor at two churches. (*Id.* at

---

[2] Plaintiff's deposition transcript, referred to as the "Dukes Deposition", is located in Document # 20-1. This Memorandum Opinion cites the minuscript pages of that deposition. When citing exhibits to Plaintiff's deposition, this Memorandum Opinion cites the electronically-generated CM/ECF page numbers.

31-32).  And, he has held the position of "dean" for an extension of the Birmingham Easonian Baptist Bible College located in Shelby County.  (*Id.* at 33-34).  As dean, Plaintiff registers students for classes, manages the facility and secretary, and helps fundraising for the bible college.  (*Id.*).

In addition to his employment positions, Plaintiff has served as the president of the Shelby County Education Support Professionals, a division of the Alabama Education Association for SCS support personnel.  (*Id.* at 49; Doc. # 22-2 at 1-2).  As a union representative, Plaintiff has helped SCS bus drivers handle problems related to bus transportation and has been consulted by SCS administrators about "bus routes, equipment, purchasing, and policies[.]"  (Doc. # 22-2 at 3).  As of the date of his deposition, Plaintiff served as president of the Shelby County chapter of the NAACP.  (Dukes Deposition at 37).

### B.    The 2012 Transportation Route Supervisor Promotion

On February 22, 2012, the Board posted a notice of vacancy with two proposed transportation route supervisor positions.  (Doc. # 20-1 at 57).  At the time they were posted, neither position had been budgeted for.  (*See id.*) (mentioning that an assistant band director position was budgeted for, but not indicating whether the route supervisor positions were budgeted for).  Thirty-nine candidates, including Plaintiff, applied for the job.  (Doc. # 20-2 at 33-35).[3]  In March 2012, SCS interviewed eleven applications, including Plaintiff, for the job.  (Doc. # 22-11 at 1).  The SCS interview panel considered all eleven candidates to be qualified for the job.  (Doc. # 20-13 at 2).  Four SCS employees interviewed the route supervisor finalists: (1) Kevin Snowden, SCS's transportation coordinator; (2) Tom Ferguson, a deputy

---

[3]  This citation refers to an exhibit to a deposition and, thus, cites the electronically-generated CM/ECF page numbers.

superintendent; (3) Rick Vines, a transportation supervisor; and (4) Mary Howard, a human resources coordinator. (Doc. # 20-4 at 16).

SCS's job description for a transportation route supervisor contains five qualifications: (1) a preference for a bachelor's degree; (2) "a complete understanding of bus route and safety issues"; (3) at least five years of school transportation experience; (4) a Class B commercial driver's license with certain bus driver endorsements, which could be obtained within six months of hiring; and (5) computer literacy. (Doc. # 22-16 at 1). A route supervisor performs several functions related to bus transportation, including:

1. Assist[ing the] Transportation Coordinator and Transportation Supervisor in the routing of buses and other operations of the [SCS] Transportation Department.

2. Mak[ing] recommendations for establishing or changing bus stops.

3. Keep[ing] records and mak[ing] reports as required. . . .

5. Assist[ing] in investigating reports of road hazards.

6. Monitor[ing] and operat[ing] two-way radio equipment in a professional manner.

7. Assist[ing] in responding to requests on route problems from bus drivers, parents, and principals.

8. Assist[ing] in training bus drivers.

(Doc. # 22-16 at 1-2).

During the interviews, the panelists asked Plaintiff and the other finalists about their training backgrounds and experiences, their perceptions about the most important function of the route supervisor position, and their experiences with software. (*E.g.*, Doc. # 20-13 at 6-7) (listing questions asked during the route supervisor interviews). They asked the applicants to describe what factors should be considered when reviewing a bus route. (*E.g.*, *id.* at 6). They

also asked the applicants to explain how they would handle certain problems, such as angry or feuding parents and overcrowded buses. (*Id.* at 6-7). The panelists rated the applicants' answers to the questions on a one to five numerical scale. (*See id.*). During Plaintiff's interview, Howard mentioned Plaintiff's race while confirming his biographical details. (Dukes Deposition at 94-95). Nevertheless, Plaintiff does not recall any inappropriate questions asked during the interview. (*Id.* at 93).

Of the eleven interviewed applicants, Brian Miller[4] received the fifth highest interview score at 103.5, and Plaintiff's interview score of 102 was sixth highest. (Doc. # 20-9 at 11). Plaintiff had the most driving experience among the interviewed applicants. (*See id.*) (recording that Plaintiff had twenty-four years' driving experience as of March 2012 and that Miller had six years' driving experience). Yet, in addition to interview performance, the panelists also considered the applicants' experience and how they thought the applicants would perform as a route supervisor. (Docs. # 20-11 at 3; 20-13 at 3; 20-15 at 3). The panelists ultimately agreed that Miller was the best candidate because he had worked as a full-time substitute bus driver for several years and had driven bus routes in several areas of Shelby County. (Docs. # 20-11 at 3; 20-12 at 3; 20-13 at 3; 20-15 at 3). Vines, the SCS employee who was responsible for route planning at the time, recalls that he believed Miller's experience as a substitute driver "gave [Miller] broader experience than the other candidates and that his knowledge of more routes in the County would give him a head start in the Route Supervisor job." (Doc. # 20-15 at 3). Significantly, all four panelists mentioned in their interview notes that Miller had worked as a permanent substitute bus driver, and three of those panelists recounted that he had worked in the

---

[4] For clarity, this Memorandum Opinion refers to Brian Miller as "Miller" and to Jim Miller by his full name.

permanent substitute position for five years.  (Docs. # 20-11 at 8; 20-12 at 6; 20-13 at 8; 20-15 at 8).

Under SCS policy, the interview panel submits a recommended applicant for hire to SCS's superintendent without providing the superintendent information about the unsuccessful applicants.  (Doc. # 20-9 at 3).  Thereafter, the superintendent makes a formal recommendation to the Board.  (*Id.*).  The parties dispute whether the Board receives information about the unsuccessful applicants.  Plaintiff asserts that the Board must receive such information because Jimmy Bice, a Board member, once told him that the Board would consider a black applicant for a position in the transportation department "if we ever get a decent resume from a black."  (*See* Docs. # 22-1 at 2; 22-2 at 1; 20-7 at 13).  To the contrary, Jim Miller, SCS's assistant superintendent for human resources, has averred that the Board receives no information about unsuccessful applicants.  (Doc. # 20-9 at 3).  Moreover, Bice has testified that he was unaware of Plaintiff's applications for the relevant positions because Board members "were never told who applied unless we asked."  (Doc. # 20-7 at 12).  In April 2012, the Board voted to approve Miller's promotion from bus driver to route supervisor.  (Doc. # 20-9 at 13-14).

The parties have also addressed the question of why SCS chose to hire one route supervisor, instead of two route supervisors.  According to Defendants, SCS's superintendent chose to only fill one route supervisor position because SCS needed to reduce expenses when one of Shelby County's municipalities, Alabaster, created a separate school district.  (Doc. # 20-10 at 2-3).  Ferguson has recalled that the panel knew there would only be one route supervisor hired by the date the interviews occurred.  (Doc. # 20-11 at 2-3).  In contrast, Plaintiff has averred that members of the interview panel told him that they were interviewing for two route

supervisors.[5]  (Doc. # 22-2 at 1).     And, Miller has recalled a high volume of hiring in 2012. (Doc. # 20-2 at 66).

### C. Plaintiff's Discussion with a Board Member About Lack of Diversity in SCS's Transportation Department

After Plaintiff failed to obtain the route supervisor position, he complained to a Board member about the racial makeup of the Transportation Department.  (Doc. # 22-2 at 5).  As Plaintiff explains in his affidavit,

> 32.     While attending a Shelby County event in 2013, I had a discussion with Aubrey Miller regarding the fact that I was denied a Route Transportation Supervisor position in 2012, and regarding the lack of minorities employed in the Transportation Department.  I advised him that there were two vacancy postings, that the second vacancy was pulled and I was not hired.  Aubrey Miller advised me to let him know when I applied for a Transportation Supervisor position in the future and he would keep an eye on it.

> 33.     I advised Mr. Aubrey Miller when I was in the process of applying for the Transportation Supervisor position in June of 2014.

(*Id.*).  Bobby Pierson, another SCS bus driver, has affirmed that the conversation between Plaintiff and Aubrey Miller occurred.  (Doc. # 22-1 at 2).  Pierson also recounts that he discussed "the fact that there are no minorities in the Transportation Department" with Lewis Brooks, an SCS assistant superintendent.  (*Id.* at 1).

---

[5]    In his opposition brief, Plaintiff insists that it would have been illogical for SCS to post two route supervisor vacancies in February 2012 if Alabaster's separation from SCS caused a need to cut personnel expenses, since Alabaster's City Council approved the formation of a new school district in November 2011.  (Doc. # 21 at 4-5).  Plaintiff's Rule 56 evidence does not support his factual argument, however.  The news article submitted by Plaintiff mentions that the Alabaster City Council approved a sales tax and a process for creating a school board and a new school district in October 2011.  (Doc. # 22-11 at 4).  But, the Alabaster school board did not approve the separation agreement until May 2013.  (*Id.*).  Defendant Fuller explains that SCS attempted to negotiate with Alabaster to keep the municipality in the school district in early 2011, but he began trimming expenses in late 2011 in anticipation that Alabaster would leave the school district.  (Doc. # 20-10 at 2-3).  Among other financial decisions, Fuller chose to not hire a second route supervisor, even though the position had been posted.  (*Id.* at 3).  This factual dispute is immaterial, however, because Fuller has testified that he did not know who had applied for the route supervisor vacancies when he decided to only hire one route supervisor.  (*Id.*).  The Rule 56 record contains no evidence contradicting that testimony by Fuller.

### D. The 2014 Transportation Supervisor Promotion

In June 2014, the Board posted a vacancy notice for a transportation supervisor position. (Doc. # 20-8 at 103). Twenty-two candidates, including Plaintiff, applied for the position. (Doc. # 20-5 at 17-18). SCS officials chose to interview four applicants, including Plaintiff, for the position. (Doc. # 20-14 at 2). Two applicants -- Plaintiff and Debra Cummings -- were interviewed by a panel on June 18, 2014. (Doc. # 22-14). For the other two applicants, the interview panel decided to rely upon the interviews those applicants had completed in connection with a different position, transportation coordinator. (Docs. # 20-9 at 5; 20-10 at 4; 20-14 at 3). Jim Miller has explained that considering a prior interview for a subsequent opening "was consistent with how we had handled similar situation in which a candidate would be interviewed for more than one position in a short time frame." (Doc. # 20-9 at 5).

The transportation supervisor serves as the second-in-command within SCS's transportation department. (Doc. # 20-2 at 31). SCS's job description for a transportation supervisor requires the transportation supervisor to hold a bachelor's degree, completely understand "bus route and safety issues," possess a minimum of five years' experience in "school transportation," and have an Alabama driver's license. (Doc. # 22-17 at 1). Moreover, a transportation supervisor "[m]ust hold or obtain a valid commercial driver's license and school bus license." (*Id.*). The Board may accept alternative qualifications to those listed in the description. (*Id.*). A transportation supervisor performs several transportation and leadership functions, including:

1. Assist[ing the] Transportation Coordinator in administering transportation program to meet all requirements of the daily instructional program and extracurricular activities.

2. Assist[ing] the Transportation Coordinator in the management and purchasing of equipment as well as in the budget planning process.

3.      Assist[ing the] Transportation Coordinator in the routing of buses and other operations of the Transportation Department.

4.      Receiv[ing] and investigat[ing] complaints against drivers and [working] with the Transportation Coordinator to enforce disciplinary measures when necessary.

5.      Mak[ing] recommendations for establishing or changing bus stops. . . .

9.      Monitor[ing] internal and external communication systems including the transportation web page in a professional manner.

10.      Responsible for video surveillance on each school bus equipped with such equipment.

11.      Assist[ing] in responding to requests on route problems from bus drivers, parents, and principals.

12.      Encourag[ing] and assist[ing] principals to have 2 bus evacuation drills a year.

13.      Assist[ing] in training bus drivers.

14.      Check[ing] road and weather conditions to assist in determining school openings and closing.

15.      Maintain[ing] maps used to determine School Boundaries and/or zoning.

16.      Assist[ing] with local and state School Bus Road-e-o. . . .

22.      Perform[ing] other job-related assignments determined by Transportation Coordinator, Deputy Superintendent, or Superintendent.

(*Id.* at 1-2). The interview panel believed that all four interviewees were qualified for the transportation supervisor position. (Doc. # 20-9 at 4-5). As discussed more fully below (in the analysis section), Plaintiff disputes that Brent Copes was qualified to become transportation supervisor because he did not hold a valid commercial driver's license at the time he was hired. (Doc. # 21 at 10).

Four SCS employees interviewed Plaintiff and Cummings for the transportation supervisor position: (1) Randy Fuller, SCS's superintendent; (2) Lewis Brooks, an assistant superintendent; (3) Jim Miller, an assistant superintendent; and (4) Vines, who had been promoted to transportation coordinator.[6]  (Doc. # 20-9 at 5).  During the interviews of Plaintiff and Cummings, the panelists asked them about their leadership experience and abilities, their plan for handling exceptions to established bus routes, their process for setting up bus stops, their plan for the first thirty to sixty days in the position, and their process for handling difficult people.  (*See, e.g.*, Doc. # 20-15 at 14).  Copes received very similar questions during his June 4, 2014 interview, except that the panelists questioned Copes on establishing bus routes, rather than bus stops.  (*See, e.g.*, Doc. # 20-9 at 18).  The first question included on the transportation supervisor score sheet included the statement "[t]his is a leadership position."  (*See, e.g.*, Doc. # 20-15 at 14).  The panelists rated the applicants' answers to the questions on a one to five numerical scale.  (*See id.*).  Of the four candidates, Copes received the highest interview score, with an average score of 3.475 per question.  (Doc. # 20-9 at 26).  Dukes obtained the third-highest interview score of 3.05 per question.  (*Id.*).

Miller, Brooks, and Fuller have testified that Copes was the best-qualified candidate due to his leadership experience as principal and assistant principal.  (Docs. # 20-9 at 7; 20-10 at 4; 20-14 at 3-4).  Vines has recounted that the other three panelists identified Copes as the best candidate.  (Doc. # 20-15 at 5).  Vines knew at the time that Copes had leadership experience as a principal and assistant principal, and he believed that Copes's work as assistant principal would provide him valuable experience as transportation supervisor because SCS assistant principals

---

[6]  Fuller, Brooks, and Miller also participated in the transportation coordinator interviews for Copes and Northcutt on June 4, 2014.  (Doc. # 20-9 at 5).  Miller included the interview scores given by a fourth panelist -- Tom Ferguson -- when calculating Copes's and Northcutt's interview scores for the transportation supervisor role.  (*Id.* at 6).

managed the transportation at their schools.  (*Id.*).  Therefore, Vines agreed with recommending Copes as transportation supervisor.  (*Id.*).  During his deposition, Vines explained that he trusted the judgment of the three panelists who had also interviewed Copes because he had less experience than them.  (Doc. # 20-4 at 29-30).

On June 24, 2014, Tom Ferguson, a deputy superintendent, submitted a written recommendation to hire Copes as transportation supervisor.  (*See* Doc. # 20-8 at 108).  The written recommendation mentioned Copes's experience as "a school administrator at the elementary, middle and high school levels."  (Doc. # 20-6 at 19).  The Board considered Ferguson's recommendation during a June 24, 2014 meeting that occurred at noon.  (Doc. # 20-8 at 108).  Three of the five Board members attended the meeting.  (*Id.*).  Two Board members -- Aubrey Miller and Steve Martin -- were absent.  (*Id.*).  This Board meeting lasted for seven minutes, and the Board merely approved Ferguson's hiring recommendations for a transportation supervisor and an elementary school principal.  (*Id.*).  Ferguson has testified that the June 24th Board meeting was a special Board meeting, rather than a regular Board meeting that would have occurred on a Thursday evening.[7]  (Ferguson Transcript at 44-45).  The three attending Board members unanimously approved Copes's promotion.  (Doc. # 20-8 at 108).  The minutes of that meeting reflect that Plaintiff gave the invocation (*id.*), but Plaintiff denies attending that meeting.  (Doc. # 22-2 at 5).

Following Plaintiff's failed promotion application in 2014, Plaintiff and Pierson confronted Bice about the lack of black employees in the transportation department.  (Doc. # 22-1 at 2).  Bice responded that SCS might not have received a good resume from a black applicant.

---

[7]  Ferguson's deposition transcript, referred to as the "Ferguson Deposition", is located in Document # 20-8.  This Memorandum Opinion cites the minuscript pages of that deposition.  When citing exhibits to Ferguson's deposition, this Memorandum Opinion cites the electronically-generated CM/ECF page numbers.

(Docs. # 22-1 at 2; 22-2 at 1).  As already referenced, Bice indicated a black applicant could be considered for a position in that department if they received a decent resume.  (*Id.*).

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.   Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*").  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### III.   Analysis

Plaintiff raises race discrimination claims under Title VII of the Civil Rights Act and 42 U.S.C. § 1981.  Title VII racial disparate treatment claims and § 1981 race discrimination claims are evaluated using the same analytical framework.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").  Thus, the court analyzes Plaintiff's disparate treatment Title VII and § 1981 race discrimination claims together for purposes of summary judgment.

Typically, Title VII and § 1981 discrimination claims that rely on circumstantial evidence are evaluated under the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) ("A plaintiff typically makes a case of discrimination through indirect evidence using the burden-shifting framework set out in *McDonnell Douglas* . . . .").  A plaintiff presents a *prima facie* failure to promote case by showing: (1) he or she is a member of a protected class; (2) he or she was qualified and applied for the promotion; (3) he or she was rejected despite being qualified; and (4) "other equally or less qualified employees who were not members of the protected class were promoted."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004), *abrogated on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).  Here, Defendants have not disputed that Plaintiff makes out *prima facie* failure to promote claims under Title VII and § 1981.[8]  (*See* Doc. # 19 at 15-16).

---

[8]   To be sure, Defendants strongly argue that the promoted individuals were more qualified than Plaintiff for the route supervisor and transportation supervisor openings.  But, because the interview panels relied on subjective qualifications to deem Miller and Copes more qualified, the court determines that the qualification issue

Once the plaintiff successfully demonstrates a *prima facie* case, the defendant is required to articulate a legitimate, non-discriminatory reason for its conduct. *Wilson*, 376 F.3d at 1087. This burden has been described as "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). "If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson*, 376 F.3d at 1087. Here, the Board explains that it promoted Miller and Copes to route supervisor and transportation supervisor, respectively, because they were more qualified for those promotions than Plaintiff. (Doc. # 19 at 16). That qualifies as a legitimate, non-discriminatory reason for the promotions. *Wilson*, 376 F.3d at 1090.

When deciding a pretext issue at summary judgment, the court evaluates "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 892 (11th Cir. 2011) (internal quotation marks and citation omitted). A legitimate reason for a decision is not classified as a pretext unless the plaintiff shows that the reason was false "*and* that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). When a pretext issue hinges on the relative qualifications of a plaintiff and another successful applicant (in other words, when a plaintiff claims pretext is demonstrated because of the relative qualifications of himself and the incumbent), the court does not rule upon whom the defendant employer "*should* have hired."

is one to be considered at the pretext stage. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768-69 (11th Cir. 2005).

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013) (emphasis in original). Rather, the court "review[s] the qualifications of the selected candidate and plaintiff, and determine[s] whether the difference between the two is of 'such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'"[9] *Id.* (quoting *Springer*, 509 F.3d at 1349).

Among other Rule 56 evidence, Plaintiff presents statistical evidence that no African-Americans have worked in SCS's transportation department -- a department within SCS's central office -- as proof of pretext. (*See* Doc. # 21 at 28). Statistical evidence can be relevant to determining whether an employer's legitimate, non-discriminatory reason for an action is pretext for discrimination. *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985). Yet, statistical evidence is not meaningful to analyzing a pretext issue if there is no way to discern whether the disparities shown by the evidence "are the result of legitimate or racially-discriminatory variables." *Ogletree v. City of Auburn*, 619 F. Supp. 2d 1152, 1170 (M.D. Ala. 2009) (quoting *Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, 2007 WL 3124452, at *20 (M.D. Ala. Oct. 25, 2007)). "Statistics without any analytical foundation are virtually meaningless." *Wilson*, 376 F.3d at 1089 (internal quotation marks omitted) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997)). For example, in *Wilson*, the court held that the plaintiff's statistical evidence that the employer had only hired two female vice-presidents for forty-four vice-president openings in a seven-year period was not probative evidence of pretext because the plaintiff offered no "other relevant information, including the number of women who expressed interest in vice president positions." *Id.* at 1088-89. Similarly,

---

[9] The court is mindful that the Supreme Court has disapproved of and abrogated the Eleventh Circuit's old "jump off the page and slap you in the face" standard for determining pretext from comparative qualifications alone. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-58 (2006). To be clear, the court has not applied this abrogated standard and has applied the post-*Ash* standard announced in *Springer*.

the Eleventh Circuit has also rejected statistical evidence about the number of black gas dealers in predominantly white areas of the Atlanta metropolitan area as "statistical evidence of discriminatory intent" where the plaintiff failed to proffer "evidence as to how many blacks applied and were rejected and evidence of the success rate of equally qualified white applicants." *Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994).

A. **Plaintiff Has Not Presented Substantial Rule 56 Evidence that the Board's Reason for Promoting Miller was a Pretext for Race Discrimination**

In their summary judgment motion, Defendants explain that Miller was a more qualified candidate for route supervisor because he "regularly drove different routes while regular bus drivers, like Plaintiff, drove the same routes every day." (Doc. # 19 at 17). Certainly, knowledge of routes across Shelby County could be valuable for a position that primarily concerns creating and changing bus routes. (*See* Doc. # 22-16 at 1). Plaintiff responds that his leadership experience, driving experience, and training experience made him more qualified for the position. (Doc. # 21 at 21) (referring to Doc. # 21 at 17-19). But, while Plaintiff certainly possessed more driving experience than Miller, Miller was a bus driver for more than five years before his promotion – the minimum transportation experience required for a route supervisor. (Docs. # 20-9 at 11; 22-16 at 1). And, the panelists who interviewed the route supervisor applicants have uniformly explained that they believed Miller possessed more knowledge about bus routes because of his substitute driving experience. (Docs. # 20-11 at 3; 20-12 at 3; 20-13 at 3; 20-15 at 3). Finally, it must be reiterated that out of eleven interviewees the panelists gave Plaintiff the sixth-highest interview score (102) and Miller the fifth (103.5). (Doc. # 20-9 at 11). The panelists thought the two were closely situated. All in all, Plaintiff's argument that he was more qualified than Miller relies on second-guessing the business judgment that substitute driving experience in several areas of Shelby County was more valuable than Plaintiff's driving

experience, which was concentrated in one area of the county. The court cannot critique such business judgments when deciding whether one applicant or another was more qualified. *Cf. Kidd*, 731 F.3d at 1207 (explaining that courts cannot second-guess honest business judgments for promoting one individual over another under Title VII). Simply put, the difference in qualifications between Miller and Plaintiff is not so vast that no reasonable person could have selected Miller for the promotion to route supervisor. *See id.* at 1206.

Plaintiff contends that Defendants' proffered rationale for promoting Miller is pretextual because one panelist rated Plaintiff's experience at the same level as Miller's experience. (Doc. # 21 at 21). But, collectively, the four panelists gave Miller an overall higher score than Plaintiff for the experience question used during the interviews.[10] (*See* Docs. # 20-11 at 6, 8; 20-12 at 6, 8; 20-13 at 6, 8; 20-15 at 8, 10) (scoring Miller at 15.5 on the training background and experience question and Dukes at 14 on that question). Plaintiff also contends that Defendants have overstated Miller's experience as a substitute driver because he worked at Oak Mountain Intermediate School for two school years, and his 2009 contract designated him as a regular bus driver. (Doc. # 21 at 6). This discrepancy in the Rule 56 record is not substantial evidence of pretext, though, because three of the four panelists recounted in their interview notes that Miller had been a permanent substitute driver for five years. (Docs. # 20-11 at 8; 20-12 at 6; 20-13 at 8). This evidence of the panelists' knowledge about Miller's substitute driving experience at the time of the interviews belies any inference that Defendants have exaggerated Miller's substitute driving experience to justify his promotion. (*Cf.* Doc. # 21 at 7 n. 4.). Neither of these factual

---

[10]    Likewise, Plaintiff insists that Ferguson could not have relied on Miller's superior technology experience as a basis for selecting him because Ferguson gave Miller and Plaintiff the same score on the technology experience question. (Doc. # 21 at 21). While it is true that Ferguson gave Miller and Plaintiff the same score on that particular question (*see* Doc. # 20-11 at 6, 8), Miller received an overall higher score on that question from the four panelists than Plaintiff. (*See* Docs. # 20-11 at 6, 8; 20-12 at 6, 8; 20-13 at 6, 8; 20-15 at 8, 10) (scoring Miller at 12.5 on the technology experience question and Plaintiff at 10 on that question).

issues presents a substantial weakness or contradiction in Defendants' rationale for the promotion decision, such that a reasonable factfinder could discredit the reliance on Miller's substitute driving experience.

Finally, Plaintiff argues that Fuller's retraction of the second route supervisor opening is evidence of pretext. (Doc. # 21 at 22). The court is not convinced. First, none of the Rule 56 evidence before the court indicates that Plaintiff would have been the applicant hired for the second route supervisor position. None of the panelists have testified that Plaintiff was their second choice, and he only received the sixth-highest interview score. Nothing in the record -- other than Plaintiff's suppositions -- indicates that he would have been selected for the second route supervisor opening in the event Fuller had decided to fill it. Second, contrary to Plaintiff's argument, the Rule 56 evidence indicates that Alabaster merely began its school district's separation process from SCS in 2011 and did not finalize the separation until 2013. (Doc. # 22-11 at 4). Although Fuller has testified that he began considering budget cuts before February 2012 (*see* Doc. # 20-10 at 2-3), the court is not persuaded that the posting of two route supervisor openings shows that Fuller had budgeted for both positions. Indeed, neither of the route supervisor positions was budgeted for when SCS began accepting applications for them in February 2012. (Doc. # 20-1 at 57). For these reasons, the withdrawal of the second route supervisor opening offers no Rule 56 evidence in support of Plaintiff's pretext argument.

Because Plaintiff presents insufficient Rule 56 evidence for a reasonable factfinder to find that Defendants' proffered reason for promoting Miller to route supervisor was a pretext for unlawful discrimination, Defendants are due to be granted summary judgment on all Title VII and § 1981 claims pertaining to the 2012 route supervisor promotion decision.

**B.** **Plaintiff Has Not Presented Substantial Rule 56 Evidence that the Board's Reason for Promoting Copes was a Pretext for Race Discrimination**

In their summary judgment brief, Defendants state that the Board promoted Copes to transportation supervisor because his leadership experience as principal and vice principal made him a superior candidate. (Doc. # 19 at 18). The Rule 56 evidence indicates that SCS wanted a transportation supervisor with prior leadership experience, as the interview score sheet described the transportation supervisor as a "leadership position." (*E.g.*, Doc. # 20-10 at 11). Copes had school-level administrative experience as principal and vice principal that Plaintiff lacked. Additionally, Copes received a higher average score on the leadership question than Plaintiff did. (*See* Docs. # 20-9 at 18-22, 28; 20-10 at 7, 11; 20-14 at 6, 9; 20-15 at 14) (giving Copes an average score of 3.625 on question one of the interview and Plaintiff an average score of 3 on that question). Plaintiff responds that the panelists' reliance on Copes's administrative experience is inconsistent with Brooks's testimony that "transportation experience" was the main qualification for a transportation supervisor. (*See* Doc. # 20-5 at 26). During his deposition, though, Brooks clarified that Copes's driving experience as a teacher and his handling of transportation issues as a principal and vice principal constituted sufficient transportation experience. (*Id.* at 30-31). And, Brooks explained that transportation experience could be gained at the school level because principals supervised transportation of students at their respective schools. (*Id.* at 32). Brooks's testimony regarding transportation experience does not contradict his testimony that Copes's leadership experience made him a more qualified candidate.

In his opposition brief, Plaintiff claims that Copes was not qualified to be a transportation supervisor because he did not hold a commercial driver's license ("CDL") at the time he was hired. (Doc. # 21 at 10-11). This argument misconstrues the transportation supervisor

qualifications. SCS required the transportation supervisor to "hold or obtain" a CDL. (Doc. # 22-17 at 1). The phrasing of this requirement plainly contemplates that a transportation supervisor could obtain his or her CDL after hiring. Indeed, Vines, who served as SCS's transportation supervisor prior to Copes's hiring, has testified that he did not acquire a CDL until after he became a transportation supervisor. (Doc. # 20-4 at 8).

Plaintiff also claims that he was more qualified than Copes because he had more transportation experience and more recent transportation experience. (Doc. # 21 at 24). But, Plaintiff fails to address the distinction between non-supervisory transportation experience and supervisory transportation experience. The transportation supervisor's primary responsibilities included administrative and management duties. (*See* Doc. # 22-17 at 1) (indicating that the supervisor's primary responsibilities included assisting the coordinator "in administering transportation program" and assisting "in the management and purchasing of equipment as well as in the budget planning process"). Copes directly supervised the bus drivers at his school when he served as an assistant principal. (*See* Docs. # 20-2 at 33; 20-3 at 20; 22-2 at 4). In contrast, Plaintiff worked in a non-supervisory role as a bus driver, although at least one of the panelists has acknowledged that Plaintiff acted as "a leader with the bus drivers." (Doc. # 20-2 at 33). The court finds that the interview panelists reasonably could have determined that Copes's supervisory and administrative experience would be superior for the transportation supervisor position. Plaintiff argues that his transportation experience should be considered superior because Copes obtained any relevant transportation experience several years before his hiring as transportation coordinator. (Doc. # 21 at 24). That argument fails to show that no reasonable person could have selected Copes, as a reasonable person could have valued Copes's less recent transportation experience -- which included supervisory and management duties -- over

Plaintiff's non-supervisory transportation experience. *Cf. Kidd*, 731 F.3d at 1206. Accordingly, Plaintiff has not established a triable issue of pretext regarding the 2014 promotion based on his comparison of Copes's qualifications to his own qualifications.

Plaintiff argues that additional evidence -- in addition to the disparity in qualifications -- shows the pretextual nature of Defendants' rationale. First, Plaintiff claims that Defendants covered up a written reprimand Copes received a month before being hired as transportation supervisor.[11] (Doc. # 21 at 25-26). Plaintiff points to Copes's testimony that he received a written reprimand in May of an unspecified year from the elementary school coordinator, and he only worked in an elementary school (Calera Intermediate School) from July 2013 to June 2014. According to Plaintiff, while logic dictates that Copes received the reprimand in May 2014, one month before the Board selected him to be a transportation supervisor (*id.* at 25), the written reprimand is not in Copes's personnel file and has not been produced to Plaintiff. (*Id.* at 26). Upon careful analysis, the court concludes that the cited Rule 56 evidence provides no support for the supposition that SCS employees covered up the reprimand. Plaintiff cites an exhibit with personnel records that does not include the written reprimand (*see* Doc. # 21 at 26) (citing Doc. # 22-4), but that omission is not probative evidence of a cover up because the personnel records therein are Miller's personnel files, not Copes's. Plaintiff observes that Miller and Ferguson lacked knowledge of the written reprimand, but any such ignorance simply is not evidence of a cover up because Copes identified Ricky Darby and Fuller as the supervisors involved in that discipline. (Doc. # 20-6 at 17-18). Likewise, Ferguson's failure to speak with Darby about Copes's work history is not evidence that SCS covered up the reprimand Copes received because, at most, it demonstrates Ferguson's ignorance about the discipline Copes received.

---

[11] Copes received the reprimand at issue for taking one of his children with him on a field trip. (Doc. # 20-6 at 17).

After careful review, the court finds no probative evidence that Defendants (or any SCS employee for that matter) covered up Copes's reprimand.

Second, Plaintiff argues that various deviations from SCS's standard procedures support his pretext argument. (Doc. # 21 at 27-28). *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."). The court is not convinced that the panelists' decision to not interview Copes again for the supervisor position qualifies as a failure to follow hiring policy. Plaintiff identifies no established policy requiring SCS to interview applicants after the job is posted, and Jim Miller merely testified that it would be normal to interview people during that period. (*See* Doc. # 20-2 at 20-21). While Fuller testified during his deposition that SCS has "a process of interviewing with questioning" and that it tries "to stay consistent to that process" (*see* Doc. # 20-3 at 33), that testimony does not provide probative evidence of a policy to interview all applicants with the same interview panel or to interview all applicants after posting an opening. The Rule 56 record shows that an SCS interview panel -- with three of the same supervisors that interviewed Plaintiff -- asked Copes essentially identical questions to those Plaintiff received. Plaintiff also contends in his opposition brief that the "hurried nature of the selection process" is proof of pretext. (Doc. # 21 at 28-29). But, Plaintiff presents no Rule 56 evidence that the Board violated any standard procedure by approving employment recommendations in a specially called meeting, rather than a regular meeting. (*See id.*). Therefore, the process by which Copes was promoted to transportation supervisor offers no significant Rule 56 evidence from which a reasonable jury could find pretext. Thus, although Plaintiff has attacked several aspects of the decisions to deny his requests for promotion and argued that Defendants should have followed different procedures in the employment process,

those arguments miss the mark. He is in essence appealing to the court's judgment as to the wisdom of Defendants' decisions. But neither § 1981 nor Title VII are designed to make federal courts "sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). *See also Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (holding that "federal courts do not sit to second-guess the business judgment of employers"), *abrogated in part on other grounds by Ash*, 546 U.S. 454 (2006).

Third, Plaintiff argues that the complete lack of African-American employees in the SCS's transportation department is statistical evidence of pretext. (Doc. # 21 at 28). Based on the Rule 56 record presented to the court, the court disagrees. Plaintiff does not present any evidence regarding the number of African-Americans who expressed interest in transportation department positions; he merely presents evidence that Pierson and he applied for transportation department positions. *Cf. Wilson*, 376 F.3d at 1089. Nor does Plaintiff offer evidence about the success rate of equally qualified white and African-American applicants. *Cf. Howard*, 32 F.3d at 524. Without such contextual evidence to assist a factfinder in analyzing why the transportation department lacks African-American employees, the statistical evidence is "virtually meaningless" to determining whether Defendants' rationale for the promotion decision is pretextual. *Wilson*, 376 F.3d at 1089.

Fourth, Plaintiff claims that the Board provided incorrect information to the Equal Employment Opportunity Commission ("EEOC") when it responded to his EEOC charge that constitutes circumstantial evidence of discrimination. (Doc. # 21 at 26-27). The court agrees with Plaintiff that the EEOC response contains some inaccurate information. The Board informed the EEOC that Fuller, Vines, Brooks, and Miller interviewed the four applicants for the

supervisor position (Doc. # 22-7 at 1), but it is apparent that Vines did not participate in the interview panel that examined Copes and Northcutt. The Board also told the EEOC that Copes "developed a computer program that created transportation routes for the bus routes," but that statement was not true, as Copes actually told the interview panel that he used mapping software to create bus routes.[12]  (*Compare* Doc. # 22-7 at 2 (Board's position statement to EEOC) *with* Docs. # 20-10 at 7, 20-14 at 6 (notes by Fuller and Brooks reflecting statement that Copes developed routes on mapping software)).  Having said that, Plaintiff incorrectly claims that the Board misrepresented the temporal proximity between Copes's promotion and his work on bus routes to the EEOC.  (Doc. # 21 at 26).  The Board's position statement avers that Copes had supervised a summer school program "[i]n the past" and that he had developed bus routes during that period.  (Doc. # 22-7 at 2).  It does not claim that he supervised the summer school program while he was a principal at Calera Elementary School (*see id.*), nor does it specify precisely when Copes created bus routes.

Although, under certain circumstances, a defendant's misstatements in an EEOC position statement may be circumstantial evidence that could support a finding of discrimination, the court concludes that this evidence is insufficient to support a triable issue of pretext here because neither misstatement involves a material issue.  One of the misstatements in the position statement concerns a procedural aspect of the promotion, and the other misstatement concerns a transportation-related qualification.  The position statement -- consistent with the Board's current briefing -- describes the transportation supervisor role as an administrative and leadership position and states that Copes had significant leadership experience.  (Doc. # 22-7 at 2).[13]

---

[12]  Copes has testified that he used mapping software to create the bus routes and did not develop his own software program.  (Doc. # 20-6 at 23-24).

[13]  The Board's position statement mentions the following about Copes's leadership experience:

Plaintiff primarily relies on *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015), where the Fifth Circuit concluded that the employer's reliance at the EEOC charge level on performance problems discovered after its decision to terminate the plaintiff a month earlier constituted evidence of pretext where the employer de-emphasized those post-decision deficiencies before the district court and the reasons offered to the EEOC were illegitimate. *Id.* at 238-39. But this case is distinguishable because the Board presented legitimate reasons to the EEOC which support the panelists' conclusion that Copes was more qualified – most importantly, that Copes held prior SCS administrative and leadership positions. Likewise, the Fifth Circuit's opinion in *McInnis v. Alamo Community College District*, 207 F.3d 276 (5th Cir. 2000), is distinguishable from this case because the Fifth Circuit observed in *McInnis* that the decisionmaker knew of the false statements in the employer's EEOC position statement when it was submitted. *Id.* at 283. No similar Rule 56 evidence has been presented here. For these reasons, the court concludes that the non-material misstatements in the Board's EEOC position statement do not establish a triable issue of pretext.[14] *See Lane v. Riverview Hosp.*, 835 F.3d 691, 697 (7th Cir. 2016) ("When an employer's response is factually wrong in a self-serving way *on a material fact*, the choice between treating it as an honest mistake or a deliberate falsehood is ordinarily a choice for a jury at trial.") (emphasis added).

---

The position for Transportation Supervisor is an administrative and leadership position. Mr. Copes was Principal at Calera Elementary School when he applied for the position at issue. . . . Mr. Copes had numerous years of experience in leadership roles. The interview committee felt Mr. Copes was the best qualified for the position.

(Doc. # 22-7 at 2).

[14] Plaintiff also cites *Chapman v. AI Transport*, 180 F.3d 1244, 1252 (11th Cir. 1999), *vacated on reh'g en banc*, 229 F.3d 1012 (11th Cir. 2000), and *Karas v. New NGC, Inc.*, 2013 WL 12109490, at *2 (N.D. Ga. Jan. 17, 2013), but those authorities are distinguishable because they address whether evidence of an inaccuracy in an EEOC position statement is admissible evidence at trial. The court does not dispute that the inaccuracies in the Board's position statement might be admissible at trial if there was sufficient evidence for a reasonable factfinder to find the Board's rationale for promoting Copes, instead of Plaintiff, incredible. That is not the case here.

Because Plaintiff presents insufficient Rule 56 evidence for a reasonable jury to find that Defendants' proffered reason for promoting Copes to transportation supervisor was a pretext for unlawful discrimination, Defendants are due to be granted summary judgment on all Title VII and § 1981 claims pertaining to the 2014 transportation supervisor decision.

### C. Plaintiff Has Not Presented a "Convincing Mosaic" of Circumstantial Evidence to Support His Race Discrimination Claims Concerning the 2014 Transportation Supervisor Promotion

Plaintiff argues, in the alternative, that he has presented a "convincing mosaic" of circumstantial evidence to create an inference of race discrimination for the 2014 promotion decision. (Doc. # 21 at 29). The court disagrees.

In *Smith v. Lockheed-Martin*, the Eleventh Circuit held that a plaintiff does not always have to establish a *prima facie* case under the *McDonnell Douglas* framework to present a triable Title VII claim of unlawful discrimination through circumstantial evidence. 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can present a triable issue of discriminatory intent through a convincing mosaic of circumstantial evidence from which a reasonable jury could find intentional discrimination by the decisionmaker. *Id.* Or, stated in other words, "[a] 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements …, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017) (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011)). In *Lockheed-Martin*, the circumstantial evidence presented by the plaintiffs was overwhelming and included: (a) a documented history of disparate treatment of Caucasian and African-American employees; (b) a spreadsheet listing employees under

investigation by name and race that the defendant's disciplinary review committee used to make disciplinary decisions; and (c) a news program reporting the defendant's struggles with racism in the workplace, which focused on violence by a white supremacist. *See id.* at 1329-40. The Eleventh Circuit concluded, among other reasons, that the plaintiffs presented a triable race discrimination claim because the defendant "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." *Id.* at 1341.

The evidence of race discrimination in this case falls far short of that presented in *Lockheed-Martin*. Plaintiff has only presented a single ambiguous (at best) statement from a Board member to support his argument that the relevant decisionmakers considered race in employment decisions. *Cf. id.* at 1329-40 (explaining in detail the less favorable treatment received by Caucasians in a defendant's disciplinary process). Despite Plaintiff's evidence that no African-Americans have been employed by SCS's transportation department, he has not offered evidence from which the court could find that Defendants systematically treated white employees more favorably than similarly situated black employees in promotion decisions. *Cf. Lewis*, 877 F.3d at 1018. And, for the reasons explained above, a reasonable factfinder could not conclude that Defendants' reason for promoting Copes was a pretext for race discrimination. *Cf. id.* Therefore, Plaintiff's Title VII and § 1981 claims regarding the 2014 transportation supervisor promotion cannot survive summary judgment on a mosaic theory.

## IV.    Conclusion

For the reasons explained above, Defendants' Motion for Summary Judgment (Doc. # 18) is due to be granted.[15]  An Order consistent with this Memorandum Opinion will be entered.

---

[15]  Because Plaintiff has failed to present a triable § 1981 violation by any of the individual Defendants, the court need not decide whether the individual Defendants are entitled to qualified immunity.

**DONE** and **ORDERED** this February 16, 2018.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE